[No. 40942.    En Banc.    March 30, 1972.]

NATIONAL BANK OF COMMERCE OF SEATTLE, *Respondent,*
v. GREG E. THOMSEN, *Appellant.*

*Vaughn E. Evans,* for appellant.

*McCord, Moen, Sayre, Hall & Rolfe* and *Charles L. Sayre,* for respondent.

ROSELLINI, J.—This is a suit to recover the balance due upon the purchase price of an automobile, including "time price differential," plus interest after the date of default,

and a collection fee and attorney's fees provided in the contract of purchase. The defendant's answer sets up affirmative defenses of lack of capacity to sue and usury.

The evidence[1] showed that the defendant had gone to Carter Motors, Inc., on a Saturday and had signed an order for the purchase of a new, 1965 Volkswagen automobile. This order showed that the price would be paid as follows: a downpayment of $1,000, a trade-in allowance of $25 and the balance to be financed. The total amount to be paid exceeded the stated price of the vehicle, $1,999.29, in the amount of $242.15.

Later the same day, the defendant paid the $1,000 downpayment and signed a "conditional sales contract," which showed the "time price differential" to be $242.15. This document provided that payments should be made to the National Bank of Commerce of Seattle, the plaintiff herein, and further provided that payment to anyone other than the National Bank of Commerce should not constitute payment thereunder. This instrument bore the seal of the plaintiff and was admittedly furnished to the dealer by the plaintiff. Charts for determining the amount of "time price differential" were also furnished the dealer by the bank.

On the following Monday, the contract was assigned to the plaintiff, which paid the dealer the amount of the purchase price. This assignment was effected in accordance with the terms of a contract between the dealer and the plaintiff, which provided that the dealer would sell to the plaintiff such "notes" as might be acceptable to the plaintiff and that the dealer guaranteed all such "notes." Conditional sale contracts were expressly included within the definition of "notes."

The defendant testified, without contradiction, that he had told the dealer that he intended to apply for a loan from a bank which had advertised an interest rate of $4.50 per $100 per year on new car loans. The dealer advised

---

[1] Parol or extrinsic evidence is admissible to show usury in a written contract. *Ostiguy v. A. F. Franke Constr., Inc.*, 55 Wn.2d 350, 347 P.2d 1049, 81 A.L.R.2d 1271 (1959).

him, he said, that he preferred that the financing be done by the plaintiff bank and that the interest rates were "pretty much normal" throughout the city. Taking the dealer's word for this, the defendant signed the contract furnished by the plaintiff. The "time price differential" provided in the contract was actually 14.61 per cent per annum. At that time, a new car loan could have been obtained by the purchaser direct from the bank at a rate of about 8 per cent. Such a loan would be made, an employee of the plaintiff testified, if the purchaser would make an initial payment of at least a third of the total price.[2]

The following week the defendant received, by mail, a payment book from the plaintiff. He made 11 of the 36 payments called for in the contract and then refused to make further payments, upon advice of counsel. Fruitless attempts to obtain further payments and to repossess the automobile culminated in this lawsuit.

Holding in favor of the plaintiff's view of the transaction, the trial court ruled that it was a bona fide conditional sale contract and that, under this court's decision in *Hafer v. Spaeth*, 22 Wn.2d 378, 156 P.2d 408 (1945), the usury statute (RCW 19.52) did not apply. The defendant's additional defense, that the plaintiff was not licensed under the Small Loan Act (RCW 31.08) and therefor could not bring suit, was ignored by the court. Judgment was entered for the plaintiff in the amount of the contract balance, plus attorney's fees of $100. No judgment was awarded for interest after default or collection fee, and since the plaintiff has not taken a cross-appeal or assigned error to the court's action in this regard, we deem any claim for such interest or fee to have been waived.

The theory that the Small Loan Act applies to the plaintiff in this transaction is urged again on appeal. The plaintiff has not seen fit to answer the contention, but it is apparent upon a reading of the statute that the act was not intended to apply to national banks, such as the plaintiff.

[2]The defendant would appear qualified for such a loan, since he made a downpayment of more than half the purchase price.

RCW 31.08.220 excepts from the operation of the chapter any person doing business under and as permitted by any law of this state or the United States relating to banks. The defendant makes no attempt to show that the plaintiff is not authorized under state or federal law to finance purchases of automobiles. Consequently, we hold that the trial court did not err in refusing to accept the defendant's theory that under the Small Loan Act, the plaintiff lacked capacity to sue.

Upon the remaining contention of the defendant, that the transaction is usurious, we are of the opinion that the trial court must be reversed. The case relied upon by that court, *Hafer v. Spaeth, supra,* did not dispose of the question presented by the circumstances of this case and is therefore not controlling.

In that case, the defendant's assignor had purchased a piano for the sum of $175, from a dealer in pianos. He had paid $30 in cash, and agreed to pay the balance at the rate of $5 per month, "with $3.50 handling charge per month or a fraction thereof." During the period between August 4, 1936, and January 19, 1939, the purchaser paid the total sum of $160 on the stated purchase price, leaving an unpaid balance of $15. He then sold his interest in the piano to the defendant. The dealer, before the commencement of the action, assigned his claim to the plaintiff for collection. When suit was brought, the defendant contended that the $3.50 per month handling charge represented interest and that the contract violated the usury statute in force at that time. (RCW 19.52.020.)

This court discussed that statute, which provided:

Any rate of interest not exceeding twelve (12) per centum per annum agreed to in writing by the parties to the contract, shall be legal, and no person shall directly or indirectly take or receive in money, goods, or thing in action, or in any other way, any greater interest, sum or value for the loan or forbearance of any money, goods or thing in action than twelve (12) per centum per annum.

The essential elements of usury, this court said, are

(1) a loan or forbearance, express or implied; (2) money or its equivalent constituting the subject matter of the loan or forbearance; (3) an understanding between the parties that the principal shall be repayable absolutely; (4) the exaction of something in excess of what is allowed by law for the use of the money loaned or for the benefit of the forbearance; and, in some jurisdictions, (5) an intent to exact more than the legal maximum for the loan or forbearance.

To determine whether all these essential elements are present, the courts will look through the form of the transaction and consider its substance. If all the requisites are found to be present, the transaction will be condemned as usurious, but, if any one or more of them are lacking, the parties cannot be charged with a usurious practice.

22 Wn.2d at 382.

The word "loan," this court said,

imports an advancement of money or other personal property to a person, under a contract or stipulation, express or implied, whereby the person to whom the advancement is made binds himself to repay it at some future time, together with such other sum as may be agreed upon for the use of the money or thing advanced.

22 Wn.2d at 384.

It was stated that if usury does not exist at the inception of the contract, the contract is not usurious.

We also recognized there that we had held in *Lyon v. Nourse*, 104 Wash. 309, 176 P. 359 (1918), and in *Hughbanks Inc. v. Gourley*, 12 Wn.2d 44, 120 P.2d 523, 138 A.L.R. 658 (1941), that it is not the office of a conditional bill of sale to secure a loan of money, but rather, only to permit an owner of personal property to make a bona fide sale on credit, reserving title in himself for security until the purchase price is paid.

It was stated in that opinion that the "vast majority" of cases dealing with transactions of the kind before the court in that instance had held that such sales do not constitute loans or come within the ban of the law against usury

unless it is evident that the transaction, though in outward form a sale and purchase, was but a cloak to hide a usurious loan.

While it is perhaps still true that the majority of courts adhere to the view that a conditional sale is not a "loan or forbearance," there is now respectable authority to the contrary. *See* Annot., 14 A.L.R.3d 1065, 1069 (1967). Also, the rationale which was commonly used to distinguish sales on credit from loans and which was set forth in *Hafer v. Spaeth, supra,* has been subjected to some rather severe criticism. *See,* for examples, W. Warren, *Regulation of Finance Charges in Retail Instalment Sales,* 68 Yale L. Rev. 839 (1959) and J. Bernstein, *Background of a Gray Area in Law: The Checkered Career of Usury,* 51 A.B.A.J. 846 (1965).

The author of the latter article says, quoting William D. Warren, professor of law at the University of Illinois, " 'Today, the belief that one borrows money from need but purchases on credit by choice is manifestly anachronistic.' " If it is true that persons who purchase on installment terms automobiles and other items of merchandise which they feel they need are under economic pressure as severe as that which influences borrowers of money to accept oppressive terms, then there is no logical reason to make a distinction between the exacting of excessive charges for deferring payments and the exacting of such charges for loaning money.

However, we are not confronted in this case with a question which makes it necessary for the court to either affirm or overrule *Hafer v. Spaeth, supra.* That case did not involve a purchase which had been financed by the plaintiff. It is true that there was an assignment of the conditional sale contract, but that assignment was made only for collection purposes and after the purchaser had defaulted.

Before turning to the question before the court, however, we think it should be noted that this court did not approve the contract under consideration there. The trial court had entered judgment for the defendant, finding that the con-

tract was usurious. While this court held that the usury statute did not apply to the particular transaction, which was a bona fide conditional sale, where the seller *retained title* as security for *his receipt* of the balance of the payments, it did not order judgment entered for the plaintiff. Instead, it remanded the case and strongly suggested that the trial court might find either that the handling charge had been waived or that it was unconscionable, calling attention to the principle that forfeitures are not favored. Thus the case does not stand for the proposition that in a conditional sale contract, the "sky is the limit."

The legislature of this state has since seen fit to regulate retail installment sales of goods and services, in RCW 63.14, the first statute being passed in 1963. Under the first legislation on this subject, there was no restriction on the amount of service charge. In 1967, a maximum of 18 per cent per annum was set, and in 1969, by initiative measure No. 245, section 3, the maximum was set at 12 per cent per annum. RCW 63.14.130.

At the time of the transaction involved in this suit, there was no statutory limit placed upon the amount of service charge to be exacted in installment sales. Since the act does not purport to regulate third-party financing of purchases of goods or services, it does not cover the question presented in this case. That question is: When a purchase is financed by a third party, is the relationship between the purchaser and the financier that of vendee and vendor or that of borrower and lender?

■   We think the answer is obvious when the question is stated. The party who furnished the money with which the purchase is made and to whom the purchaser obligates himself to repay that money is a lender. It follows that the charge which is made for that loan is interest, and the usury statute prohibits the exacting of such interest at a rate greater than 12 per cent per annum.

All of the facts of this case are consistent with the theory of a loan and inconsistent with a theory of credit sale, except, of course, the *form* of the transaction.

The purchase order showed that the balance of the purchase price (after the cash payment of $1,000, and the trade-in allowance of $25) was to be financed. This means that the dealer was not to extend credit to the defendant, but rather was to be paid in full at the time of the sale. It is true that the dealer did not receive the money until the following Monday, but that was only because the lending institution was closed for the weekend. The dealer was certain that it would be paid—so certain that it exacted from the purchaser a promise to make all his time payments to the plaintiff.

The plaintiff's employees, in attempting to collect delinquent payments from the defendant, referred to the transaction as a loan. They referred to it as a loan in their testimony and also testified to the effect that there is no practical difference between "time price differential" and "interest."

■ The plaintiff attaches much significance to the fact that there was no direct contact between it and the defendant prior to the signing of the contract. We do not find this fact controlling. Even if the plaintiff had not authorized the dealer to represent to purchasers that it would finance their purchases of new cars, the representation was made and it was ratified by the plaintiff when it accepted the contract, which showed on its face that all payments were to be made to the plaintiff.

Ratification is the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him. Restatement (Second) of Agency § 82 (1958). As stated in section 83 of this chapter, affirmance is either (a) a manifestation of an election by one on whose account an unauthorized act has been done to treat the act as authorized, or (b) conduct by him justifiable only if there were such an election.

The conduct of the plaintiff in this instance falls within these principles. The true nature of the transaction was

that plaintiff placed in the hands of the dealer indicia of authority to represent that it would finance new car purchases, that the representation was in fact made to the defendant, and that the purchase was in fact financed by the plaintiff. Thus, at the moment the contract was signed, the defendant became indebted, not to the dealer, but, in accordance with the terms of the contract, to the plaintiff. The plaintiff loaned him the money with which to purchase the car. The fact that the dealer guaranteed the loan does not change the nature of the basic transaction.

This court has recently held, in *State ex rel. O'Connell v. PUD 1*, 79 Wn.2d 237, 484 P.2d 393 (1971), that the purchase of a conditional sale contract is a loan of money. While the opinion does not specify that the loan is made to the vendee, it is obvious that this is the case. The vendor receives no loan; he receives the purchase price for the sale of his interest. At the same time, the vendee's debt to the vendor is paid, and he is thereafter indebted to the purchaser of the contract for the balance owed.

It is correct that one who sells goods or services on credit is not a lender of money. But a third party who pays the seller on behalf of the purchaser is, insofar as his relations with the purchaser are concerned, a lender of money. In a case such as this, where the purchase is financed from the beginning, there is never a true *conditional* sale. The sale is complete as far as the vendor is concerned. He does not extend credit to the purchaser; rather, he is paid in full at the time of purchase. The "conditional sale contract" is then but a security device to protect the party who finances the purchase.

We have said that it is not the office of a conditional sale contract to secure a loan of money. *Hughbanks Inc. v. Gourley, supra; Lyon v. Nourse, supra; Hafer v. Spaeth, supra.*

In the *Hughbanks* case, this court said:

This particular security device [conditional sale], with its severe remedial incidents, is not favored in the law, and its use has been restricted to situations where per-

sons standing in the actual relation of vendor and vendee have desired to effect a credit sale. It is in such cases that it finds its only legitimate use.

12 Wn.2d at 49.

It was not for such a purpose that the conditional sale device was used in this case. Rather, a cash sale was effected and the conditional sale was used as a security device to protect the institution which loaned the defendant the money to purchase the automobile.

We bear in mind that usury must exist, if it exists at all, at the inception of the contract. Here, it was never contemplated that the dealer would extend credit to the defendant. Rather, the agreement was that the full purchase price would be paid, and that a portion of the purchase price which the defendant was not prepared to pay would be loaned to him by a financing institution. It was represented to him that the plaintiff would make the loan, and the plaintiff did so.

Since the transaction, as between the plaintiff and the defendant, was a loan of money, the time price differential represented interest, and the interest charged was greater than that permitted under RCW 19.52.020. The United States Court of Appeals for the Fifth Circuit reached the same conclusion about the nature of such a transaction. *Daniel v. First Nat'l Bank,* 227 F.2d 353, 239 F.2d 801 (5th Cir. 1955-1956). *See also Sloan v. Sears, Roebuck & Co.,* 228 Ark. 464, 308 S.W.2d 802 (1957), and cases cited therein; and *see* cases cited in 14 A.L.R.3d 1065, 1072 (1967).

The plaintiff does not contend that it was unaware that the charges for the loan exceeded 12 per cent per annum, or that the amount was charged through mistake or inadvertence. On the contrary, its theory is that it had the right to collect the full amount provided in the contract.

The contract was usurious. Consequently, the plaintiff cannot recover the full amount of the balance under the terms of the contract, but only the principal amount owed, less the interest accrued and unpaid, and less twice the amount of interest paid.

The defendant has not challenged the award of attorney's fees. That portion of the judgment is affirmed.

The judgment is otherwise reversed and the cause remanded with directions to enter judgment in accord with the law as set forth herein.

HAMILTON, C.J., FINLEY, HUNTER, HALE, and WRIGHT, JJ., concur.

HALE, J. (concurring specially)—I have signed the court's opinion and concur in all of its implications except that part which implies that *Hafer v. Spaeth*, 22 Wn.2d 378, 156 P.2d 408 (1945), is not explicitly overruled. Despite the disparate analyses set forth in both the majority and the concurring-dissenting opinions, *Hafer*, I think, should be overruled and I would explicitly say so.

*Hafer* should be overruled because its reported facts do not, in my opinion, support the court's legal conclusion. There, a piano was sold on what is described as a conditional sale contract calling for payments of principal at $5 per month plus an additional $3.50 per month for "handling charges." It was this handling charge—whether for handling the weekly payments or the piano is not completely clear—which gave rise to that case. Thus, of $8.50 paid each month, only $5 was applied to the debt and the $3.50 paid nothing except the "handling charge" which, according to the *Hafer* opinion, would continue to accrue until the principal balance had been finally paid off by the $5 monthly allotment. In what appears to me to have been an erroneous conclusion, this court, I think, misconstrued the language of the usury statute to hold that the $3.50 described as handling charges each month, that is $3.50 each month for handling the other $5, did not constitute usury because the statute, it was said, did not apply to the sale of goods on conditional sale but only to the loan of money. *Hafer v. Spaeth, supra* at 383. That opinion, I think, ignores the express language of the statute which says:

Any rate of interest not exceeding twelve (12) per centum per annum agreed to in writing by the parties to

the contract, shall be legal, and no person shall *directly or indirectly* take or receive *in money, goods or thing in action, or in any other way,* any greater interest, sum or value *for the loan or forbearance of any money, goods* or thing in action than twelve (12) per centum per annum.

(Italics mine.) Laws of 1899, ch. 80, § 2, p. 128.[3]

That statute, as I see it, should have been read then and should be read now in pari materia with RCW 19.52.010, which says:

Every loan or forbearance of money, goods, or thing in action shall bear interest at the rate of six percent per annum where no different rate is agreed to in writing between the parties. The discounting of commercial paper, where the borrower makes himself liable as maker, guarantor or indorser, shall be considered as a loan for the purposes of this act.

In speaking of every loan or forbearance of money, goods or thing in action, the statute expressly included not only the forbearance to repossess the goods so long as the handling charges are paid each month, but encompasses the *discounting of commercial paper* (RCW 19.52.010), and in addition explicitly prohibits more than 12 per cent interest, *directly or indirectly.* RCW 19.52.020. To complete the bar, the statute in direct language prohibits *in any other way* any greater *interest,* sum or value for the loan or forbearance of any money or goods. To me, the conclusion is inescapable that both the sale of a piano as in *Hafer* or an automobile as in this case are transactions covered by the usury statute.

FINLEY and WRIGHT, JJ., concur with HALE, J.

STAFFORD, J. (dissenting in part and concurring in part) —I agree with the majority that defendant, Greg Thomsen, should prevail. However, the divergent legal theories leading to that end necessarily produce results that differ in kind.

While acknowledging that a vast preponderance of the

---

[3]Laws of 1899, ch. 80, § 2, p. 128, were amended by Laws of 1967, Ex. Ses., ch. 23, § 4, p. 1510, which is not material here.

courts and legal authorities agree that a conditional sale is not a "loan or forbearance", the majority goes on to say that there is now respectable authority to the contrary. It is of note, however, that few of the authorities go to the extremes of the majority opinion to avoid the fact of "assignment" and to adopt a theory of "agency" that is so necessary to its outcome.

The majority ignores the fact that the plaintiff bank was injected into the case as an *assignee* of Carter Motors, the automobile's original vendor. The opinion is based primarily on an assumption that a relationship of lender and borrower existed between the bank and Greg Thomsen. But, in doing so, the majority ignores the trial court's finding of fact that no contact or negotiations took place between the bank and Thomsen. The legal chasm is bridged by the simple expedient of declaring that Carter Motors was an agent of the bank.

This unique factual position is derived by ignoring the trial court's findings of fact without first having determined that they were either opposed to or unsupported by substantial evidence. In effect, the majority made its own findings on the subject of agency despite findings or lack of findings made by the trial court. Further it stems in part from the majority having accepted certain of Thomsen's unchallenged testimony. This, of course, flies in the face of numerous cases in which we have held that a trial court need not accept or give credence to testimony merely because it is unopposed.

Finally, the opinion may solve one litigant's immediate problem, but it does so by adopting a view that is decidedly minority in nature. It also makes a 180 degree turn which may place in jeopardy thousands of longtime commercial transactions made in good faith and in reliance upon our prior adherence to the view held by most courts and other legal authorities. This not only may have an adverse effect upon assignee banking institutions *but on many small individual assignee holders of such paper.*

The change should not be entered into in such a cavalier

fashion. In fact, it is an unnecessary step. At the time in question Thomsen had statutory relief available to cover the problem he faced. Unfortunately, the statute was mentioned by the majority but its effect was passed over.

At the risk of prolonging this, I am compelled to review the facts and statutes in existence at the time the case arose.

Greg Thomsen, the defendant, decided to buy a new automobile. On Saturday, July 31, 1965, when he entered Carter Motors, Inc., he was the owner of an old Studebaker and had $1,000 in his pocket. The car he wanted was in stock. As a result he emerged a few hours later with a new Volkswagen, a potential lawsuit, and copies of two written documents (*i.e.,* one was entitled "Purchase Order" and the other was entitled "Automobile Conditional Sales Contract"). Each document had been executed by him, within a short time of the other, during separate conferences with the Carter Motors' salesman.

Monday, August 2, was the next business day of the Ballard Branch of the National Bank of Commerce. On that date, Carter Motors assigned to it the "conditional sales contract".

Greg Thomsen paid all installments to the bank up to and including the one due July 15, 1966. Thereafter he made no further payments.

The bank, as assignee of the "conditional sales contract", sued for the balance said to be due thereunder. Thomsen answered and alleged that the true transaction did not involve a "conditional sales contract" but in fact was a "loan" for the balance due on the purchase price of the automobile. He also charged that the alleged "conditional sales contract", and its subsequent assignment to the bank, was a sham to cover the true "loan" transaction between himself and the bank. By way of a partial defense, Thomsen asserted that the "loan" was tainted with usury.

The trial court held that the transaction involved a "conditional sales contract"; that the "service charge", in the form of a "time price differential" (amounting to 14.61 per

cent per year), was not unconscionable; and that the law of usury does not apply to "conditional sales contracts." The court entered judgment for the bank in the amount of $844.75 (which included "service charges" in the form of "time price differential"), and awarded $100 attorney's fees as well as costs and disbursements.

Thomsen has appealed, assigning error to 11 of the trial court's findings of fact. Essentially, it is urged that the trial court should have believed testimony supporting his theory of the case. In this regard, it is clear the trial court found it necessary to resolve several disputes of fact and decided them in favor of the bank. It is not our function to reevaluate the credibility of witnesses. *In re Estate of Kleinlein,* 59 Wn.2d 111, 366 P.2d 186 (1961); *Sheldon v. Hallis,* 72 Wn.2d 993, 435 P.2d 988 (1967).

Thomsen asserts that although the Carter Motors' agent (*i.e.,* the automobile salesman who had prepared both the "purchase order" and the "conditional sales contract" for Thomsen's signature) was available, the bank failed to call him. Thus, Thomsen argues, the trial court erred by failing to find that had the salesman been called he would have testified adversely to the bank and would have supported Thomsen's theory that a "loan" had been transacted.

The argument is not well taken. The failure to call such a witness creates no more than a permissive inference. Wiehl, *Instructing a Jury in Washington,* 36 Wash. L. Rev. 378, 386-90 (1961); National Conference of Commissioners on Uniform State Laws, Uniform Rules of Evidence, Rule 13 (1953); 1 B. Jones, The Law of Evidence § 9 (5th ed. 1958). It neither takes the place of evidence of material facts nor shifts nor satisfies the burden of proof so as to relieve the party who has that burden. 31A C.J.S. *Evidence* § 156 "Strength of Inference" at 417 (1964).

A review of the full record reveals that, with the exception of findings of fact 3, 9, 12 and 13 (to be discussed hereafter) all are supported by substantial evidence. Thus, they should be accepted as established facts. *Leonard v. Washington Employers, Inc.,* 77 Wn.2d 271, 461 P.2d 538

(1969); *Moss v. Vadman,* 77 Wn.2d 396, 463 P.2d 159 (1969). This being the case, one must conclude that the instrument upon which the instant action is based was a "conditional sales contract" and not a "loan".

Mr. Thomsen contends we should overrule *Hafer v. Spaeth,* 22 Wn.2d 378, 156 P.2d 408 (1945). *Hafer* holds that a *bona fide* "conditional sales contract" does not constitute a "loan" of money; that "handling charges" are not "interest"; and that such a transaction does not come within the purview of the usury law.

It is argued that in an age when the financing agent has become so intimately involved in the original sales, the reasons relied on in *Hafer* no longer ring true. Nevertheless, the basic rule in *Hafer* still remains the prevailing view. 6A A. Corbin, Contracts § 1500 (1962); 6 S. Williston, A Treatise on the Law of Contracts § 1685, at 4766 (rev. ed. 1938); 2 Restatement of Contracts § 526, illustration 4 at 1023 (1932); Annot., 104 A.L.R. 245 *et seq.* (1936); 14 A.L.R.3d 1069 *et seq.* (1967).

Subsequent to *Hafer* the legislature adopted the Retail Installment Sales Act, RCW 63.14.010 *et seq.* In so doing, it not only authorized the use of "service charges" (which includes "time price differential"), but when the instant contract was executed in 1965 the legislature still had not limited the amount of "service charge" that could be imposed.[4] Thus, it cannot be said, as a matter of law, the trial court abused its discretion by holding that a "service charge" amounting to 14.61 per cent per annum was not unconscionable.

Despite the legislative amendment of 1967 and the 1968 amendment by initiative limiting the amount authorized as a "service charge", "service charges" were neither eliminated nor restricted in their application as proper costs of

---

[4]Subsequent to the instant transaction, RCW 63.14.040 was amended in 1967 to limit "service charges" to 18 per cent per annum computed monthly. In 1968 it was amended again, by Initiative 245, to provide that "service charges" were limited to 12 per cent per annum computed monthly. In this regard see RCW 63.14.040(2)(d).

obtaining a conditional sales contract nor were they characterized as "interest" paid on a "loan". Thus, one must conclude that "service charges" authorized by the Retail Installment Sales Act are not subject to RCW 19.52.030 covering usury.

The legislative history of the Retail Installment Sales Act has served to emphasize, not abrogate, the difference between "loan" and "sales", "interest" and "service charges" with which *Hafer* was concerned. In light of circumstances existing at the time the instant contract was executed, we should not overrule *Hafer v. Spaeth, supra.*

The trial court's memorandum opinion was incorporated in its findings of fact and conclusions of law. That opinion makes it evident the outcome of the case was governed by the 1963 version of the Retail Installment Sales Act. RCW 63.14.010 *et seq.*

The act authorizes the imposition of a "service charge". Nevertheless, it also provides that a seller may not recover it if he fails to obey the requirements of the act. RCW 63.14.180. In short, full compliance with the act was an issue necessarily involved in the instant litigation. In this regard, it is clear the trial court felt there had been full conformance. The bank's brief makes it equally clear that, in its opinion, its assignor had fully complied. Thus, the necessity of acting in accordance with the statute is properly before us. *Maynard Inv. Co. v. McCann,* 77 Wn.2d 616, 465 P.2d 657 (1970). It is not being considered for the first time on appeal.

The trial court found that Thomsen signed the "conditional sales contract" (exhibit 1) on July 31, 1965. It appeared to have been prepared in compliance with the Retail Installment Sales Act. It contained the requisite terms for payment of "time price differential", a breakdown of the monthly installments to be paid, and the other items required by RCW 63.14.040. The instrument was signed the same day by Wade Carter, an officer of Carter Motors. On August 2, 1965, Carter Motors assigned it to the bank. The

"conditional sales contract" pertained to a deluxe 1965 Volkswagen sedan, model 113, serial No. 115 859 858.

The statement of facts and exhibits indicate that only a few hours prior to executing the "conditional sales contract", a Carter Motors' salesman filled out, and had Mr. Thomsen sign, a "purchase order" (exhibit 4) for *exactly the same vehicle* (*i.e.*, a deluxe 1965 Volkswagen sedan, model 113, serial No. 115 859 858). The vehicle was actually in stock and was to be delivered to Mr. Thomsen in a matter of hours. The purchase order was signed by both Mr. Thomsen and the salesman.

Mr. Carter explained that ordinarily a "purchase order" is not binding without his personal signature. He testified, however, that he accepted and acted on it despite the lack of signature. In explaining the "purchase order's" significance, he said:

This is the offer and acceptance. It states what type of car that he is buying for how much and how.

The "purchase order" (exhibit 4) signed by Thomsen contained all data required to place it within the purview of the Retail Installment Sales Act with the exception of: (1) "the dollar amount or rate of the service charge" and (2) "the amount of time balance owed by the buyer to the seller . . ." RCW 63.14.040. It even provided, as did the "conditional sales contract" (exhibit 1), that the purchaser would not receive title to the automobile until final cash payment was made. It also provided, in a manner similar to the "conditional sales contract", for the balance to be paid in *36 payments of $33.79.* Thus, it was much more than a mere "purchase order." It was a contract that provided for installment payments as well as "service charges" (computable from the payment schedule) and contained a security agreement. With the two exceptions listed above, the "conditional sales contract" and the "purchase order" covered the same property, contained identical terms of payment and had similar terms of security.

Herein lies the problem. The "conditional sales contract"

(exhibit 1) specifically provides for a "time price differential" of $242.15; the "total time balance" of $1,216.44 is listed as required by RCW 63.14.040. On the other hand, the "purchase order" (exhibit 4) has a line drawn through the space for "contract balance", it provides for a "balance to be *financed*" in the amount of $974.29, and yet simple computation indicates the installment payments include an undisclosed "service charge" or "time price differential" that would produce an undisclosed "total time balance" of $1,216.44. Such failure to disclose these items does not comply with RCW 63.14.040.

Each document was completed within a short time of the other. They are in similar, although not identical, terms. Each is enforceable and *could* lead to a similar legal result, yet, each has a real potential for a *conflicting* interpretation. At best, it can be said that Carter Motors' preparation of the two documents for Thomsen's signature created both an ambiguity and a lawsuit.

The trial court erred in finding of fact 3 by failing to reflect that the transaction was contained in two documents (plaintiff's exhibit 1 and defendant's exhibit 4) rather than in one.

Finding of fact 12 was in error wherein it held that the "conditional sales contract" truly and fairly set forth the transaction between the parties. It, like finding of fact 3, failed to reflect that the true transaction was contained in two documents.

RCW 63.14.020 provides in part as follows:

> Every retail installment contract shall be contained in a *single document* which shall contain the *entire agreement of the parties* including any promissory notes or other evidences of indebtedness between the parties *relating to the transaction* . . .

(Italics ours.)

Obviously, the foregoing provision is designed to protect a buyer from deception or from ambiguities that may arise from the existence of more than one document covering the same transaction.

Whether the two contracts may have merged or may have become integrated is not before this court. These common-law doctrines were not changed by RCW 63.14.020. A seller's failure to comply with the "single document" provision does not render the contract unenforceable, it merely restricts the seller's recovery to "an amount equal to the cash price of the goods and the cost to the seller of any insurance included in the transaction." RCW 63.14.180.

If a seller desires to impose the authorized "service charges", he must comply with the act. If he fails to do so, he

> shall be barred from the recovery of any *service charge,* official fees, or any delinquency or *collection charge* under or in connection with the related retail installment contract or purchases under a retail charge agreement . . .

(Italics ours.) RCW 63.14.180.

Carter Motors prepared, and had executed, two similar documents covering the *same* motor vehicle. Each document was legally enforceable on its face. One was assigned to the bank (exhibit 1), and the other was retained in the files of Carter Motors (exhibit 4). This violated the "single document" provision of the Retail Installment Sales Act. RCW 63.14.020. As a result, Carter Motors would not have been entitled to recover "service charges" and "collection charges". RCW 63.14.020, 63.14.180. The assignee bank stands in the shoes of its assignor. 3 S. Williston, A Treatise on the Law of Contracts § 432 "Rights of the Assignee Against the Debtor" (3d ed. 1960).

Finding of fact 9 was in error wherein it stated that $844.75 was presently due and owing the bank under the "conditional sales contract." That amount incorrectly included "service charges" to which the assignee bank was *not* entitled. RCW 63.14.180.

Finding of fact 13 pertaining to the award of an attorney's fee is also in error. Under RCW 63.14.180 the assignee bank is not entitled to collection charges. Costs of collection or collection charges include an attorney's fee in connection

therewith. *McClain v. Continental Supply Co.*, 66 Okla. 225, 168 P. 815 (1917); *Letcher v. Wrightsman*, 60 Okla. 14, 158 P. 1152 (1916); *Cox v. Hagan*, 125 Va. 656, 100 S.E. 666 (1919); *see also Ben Constr. Corp. v. Snushall*, 44 Misc. 2d 878, 254 N.Y.S.2d 948 (1964) in which the phrase "delinquency and collection charges" was held to include attorney's fees.

The plaintiff bank, as assignee of Carter Motors, is entitled to judgment against defendant Thomsen. However, it is not entitled to collect any "service charges" in the form of "time price differential" and it is not entitled to an attorney's fee.

The application of this case to the "single document" provision of RCW 63.14.020 should be prospective insofar as it is concerned with the combined use of "purchase orders" of the type here involved, and "automobile conditional sales contracts".

One final point must be made. The majority states that the purchase of a conditional sales contract is a loan of money. For support of that proposition they cite *State ex rel. O'Connell v. PUD 1*, 79 Wn.2d 237, 484 P.2d 393 (1971). That case does not support the proposition.

*O'Connell* holds merely that the purchase of a *vendor's interest* in a conditional sales contract is *a loan of money to the vendor*, from the one who purchased the vendor's interest in the contract. Even under the facts used herein by the majority, no such proposition is before us. The majority should not attempt to extend *O'Connell* beyond the facts and the law stated therein.

The judgment should be modified and affirmed as suggested herein.

DONWORTH and WEAVER, JJ. Pro Tem., concur with STAFFORD, J.

Petition for rehearing denied June 12, 1972.