[No. 23273-5-III.   Division Three.   August 23, 2005.]

CLAIR H. BELL ET AL., *Appellants*, v. LEON MULLER ET AL., *Respondents*.

*Alan L. McNeil*, for appellants.

*James A. Domanico*; and *Joseph T. Reuter* and *William Resnik* (of *Preston Gates & Ellis, L.L.P.*), for respondents.

¶1 SCHULTHEIS, J. — Washington's usury statute does not apply to retail installment sales transactions. RCW 19.52-.100, .120. Under the chapter on retail installment sales, the legislature simply provides that the interest rate, or "service charge," in a retail installment contract must not exceed the amount or rate agreed to by contract. RCW 63-.14.130(1). However, Washington's Consumer Loan Act

(CLA), chapter 31.04 RCW, fixes rates for certain high risk loans at 25 percent or less. RCW 31.04.105(1). This appeal addresses the effect of the CLA, if any, upon retail installment sales contracts.

¶2 Appellants Clair and Josephine Bell assign error to the trial court's order granting summary judgment dismissal of their suit against Central Valley Auto Sales, its owners Leon and Julie Muller, People's Credit Company, Inc., and Travelers Casualty & Surety Company. The Bells contend Central Valley and People's Credit extended a loan that violated the CLA and did not properly disclose the terms of the loan under the Truth in Lending Act (TILA), 15 U.S.C. §§ 1601-1667f, and Regulation Z, 12 C.F.R. § 226. We are compelled by unambiguous statutory language to conclude that the Bells entered into a retail installment sales transaction that was exempt from the usury laws and the CLA. Summary dismissal of the CLA action accordingly was proper. We also affirm dismissal of the claims based on TILA and Regulation Z. However, the Bells raise issues of material fact regarding a hidden administrative charge that arguably violates former RCW 46.70.180(2) (2001). Summary dismissal of that claim is reversed and remanded for trial.

FACTS

¶3 The Bells had filed for bankruptcy protection in 1996 and were a higher than average credit risk. On the evening of April 14, 2003, they went to Central Valley Auto Sales in Spokane to see about buying a used van. Central Valley had a prominent sign posted that stated, "Buy Here, Pay Here." Clerk's Papers (CP) at 19. However, Central Valley explained to the Bells that the van could not be financed in-house and that any retail installment sales contract they executed would be sold or transferred to someone else.

¶4 The Bells completed a credit application that night and entered into a conditional sales contract and security agreement with the van as collateral. The document, entitled "Retail Installment Sale Contract," set out the following "Federal Truth-In-Lending Disclosures": an annual percent-

age rate of 29.95 percent; the amount financed ($4,407); the finance charge ($1,509); the total payments (adding the amount financed to the finance charge); and the total sale price ($7,216), including the down payment. CP at 28. Other listed charges included a "License Fee" of $73.50. CP at 28. The Bells traded in their 1988 Toyota 4Runner for a value of $800 and paid an additional $500 for a total down payment of $1,300. The balance was payable in 24 payments of $246.

¶5 One or two days later, the Bells learned that People's Credit had assumed their contract. People's Credit sent a letter to the Bells on April 22, 2003 officially informing them that it had purchased the retail installment contract. The Bells were current on their payments to People's Credit until the debt was paid in full in February 2004.

¶6 In August 2003, the Bells sued Central Valley, the Mullers, People's Credit, and Travelers for violations of several state and federal statutes, including the CLA (chapter 31.04 RCW), the Collection Agency Act (chapter 19.16 RCW), the Fair Credit Reporting Act (chapter 19.182 RCW), the motor vehicle dealers and manufacturers act (chapter 46.70 RCW), the Consumer Protection Act (chapter 19.86 RCW), TILA, and Regulation Z. Central Valley, Travelers, and the Mullers (hereafter Central Valley) moved for summary judgment on March 12, 2004, as did People's Credit separately. The trial court granted the defendants' joint motions for summary judgment and dismissed the Bells' suit on May 19, 2004. The Bells' motion for reconsideration was denied in July 2004 and this appeal timely followed.

EFFECT OF THE CLA ON A CONDITIONAL SALES CONTRACT

¶7 The Bells initially contend their agreement with Central Valley was not a retail installment sales contract and therefore was not exempt from the usury laws of chapter 19.52 RCW. They assert that People's Credit financed the transaction from the beginning and directly loaned them the funds to purchase the van. This loan carried an interest rate significantly higher than what is allowed under chapter 19.52 RCW. Such high-interest loans, they continue, must be

authorized by the CLA, which prohibits interest rates over 25 percent. Alternatively, they argue that even retail installment sales contracts exempt from the usury laws are subject to the interest limits of the CLA. These issues involve the harmonizing of three statutes: chapter 19.52 RCW (usury), chapter 63.14 RCW (retail installment sales of goods and services), and chapter 31.04 RCW (the CLA).

¶8  Our objective in the interpretation of statutes is to give effect to the intent of the legislature. *Am. Cont'l Ins. Co. v. Steen*, 151 Wn.2d 512, 518, 91 P.3d 864 (2004). We first look to the language of the statute. *Id.* If the language is clear and unambiguous, we glean the legislative intent from the words of the statute itself. *Agrilink Foods, Inc. v. Dep't of Revenue*, 153 Wn.2d 392, 396, 103 P.3d 1226 (2005). The definitions included in the statute are controlling; if a term is not defined, we ascertain its plain and ordinary meaning from a standard dictionary. *Am. Cont'l*, 151 Wn.2d at 518. A statute is ambiguous if it can be reasonably interpreted in more than one way. *Id.* However, we will not find ambiguity merely because we can imagine a variety of alternative interpretations. *Id.* Our review of a statutory interpretation is de novo. *Agrilink*, 153 Wn.2d at 396.

¶9  The statutes in question here relate to consumer transactions involving loans and allowable interest rates. Washington's usury statute provides that a legal interest rate is no higher than 12 percent per annum or 4 percentage points above the recent average treasury bill rate. RCW 19-.52.020(1). These limits on the interest rate are generally applicable to every loan or forbearance of money, goods, or things in action. RCW 19.52.020(1). However, the usury statute specifically exempts retail installment transactions, whether or not they are construed to be loans or forbearance of any money, goods, or things in action. RCW 19.52.100. It also exempts sales contracts for goods with deferred payments of the purchase price. RCW 19.52.120.

¶10  The Bells contend their agreement did not constitute a retail installment transaction because Central

Valley never actually financed the sale. A retail installment transaction is defined in RCW 63.14.010(8) as

> Necessity. A retail installment sales contract that informs the any transaction in which a retail buyer purchases goods or services from a retail seller pursuant to a retail installment contract, . . . which provides for a service charge, . . . and under which the buyer agrees to pay the unpaid principal balance in one or more installments.

A retail installment contract is further defined as a contract entered into for a retail installment transaction and includes conditional sales contracts. RCW 63.14.010(9). The terms in these definitions are clear and unambiguous. Nothing in these definitions requires the retail seller to provide the financing for the transaction. The Bells were retail buyers who purchased "goods" (the van) pursuant to a conditional sales contract with a service charge, and who agreed to pay the unpaid balance in one or more installments. (*See* CP at 11, where the Bells allege in their complaint that they executed "a conditional sale contract and security agreement.") The sale was conditional because Central Valley (and later, People's Credit) retained the title to the van until the balance was paid. *Beatty v. W. Pac. Ins. Co.*, 74 Wn.2d 530, 534, 445 P.2d 325 (1968). Consequently, the Bells entered into a conditional sale, or retail installment sales contract, which is exempt from the usury laws under RCW 19.52.100.

¶11 The Bells urge this court to look beyond the form of this transaction to its substance, citing *National Bank of Commerce of Seattle v. Thomsen*, 80 Wn.2d 406, 495 P.2d 332 (1972). In *Thomsen*, the buyer bought a new vehicle from a dealer with a down payment and an agreement to pay the balance over several installments. According to the conditional sales contract, the buyer would make payments directly to a bank that was financing the sale. The contract was furnished to the dealer by the bank, which had an agreement with the dealer to buy all such contracts, if acceptable. *Id.* at 407. The bank had also provided the dealer charts to determine the interest rate (called the "time price differential"). *Id.* On the next business day after the trans-

action was executed, the contract was assigned to the bank. When the buyer eventually refused to make payments, the bank sued. The Supreme Court reversed the trial court's entry of judgment for the bank, holding that the transaction was, in substance, a direct loan from the bank to the buyer. *Id.* at 412. Noting that courts look through the form of a transaction and consider its substance in usury cases, *Thomsen* held that this transaction was actually a cash sale, with a conditional sale used as a security device to protect the bank. *Id.* at 410, 415. Because the interest on the loan to the buyer exceeded 12 percent per annum, the contract was usurious. *Id.* at 415.

¶12 The transaction at issue here is very similar to the one in *Thomsen*, which has never been overruled. However, in enacting RCW 19.52.100 and RCW 19.52.120 in 1981, the legislature apparently, if not directly, abrogated the *Thomsen* holding. RCW 19.52.100 specifically provides that all retail installment transactions are exempt from the chapter's usury limits, whether or not the transactions are construed to be loans. In adopting RCW 19.52.120, the legislature expressly exempted sales contracts for goods that involve deferred payment of the purchase price, "notwithstanding the existence or occurrence of any one or more of the following events":

(1) That the seller may have arranged to sell, pledge, indorse, negotiate, assign, or transfer the obligations thereof to any person, including a financing organization, prior to or subsequent to or concurrently with the making of the sales transaction;

(2) That the amount of the finance charge, however denominated, is determined by reference to charts, computations or information supplied by such person;

(3) That the form or forms of instruments used to evidence the sales transaction have been supplied or prepared by such person;

(4) That the credit standing of the purchaser is or may have been evaluated by such person;

(5) That the sales transaction and the execution of any instrument evidencing the same is negotiated in the presence or with the assistance of a representative of such person;

(6) That the instrument or instruments used to evidence the sales transaction are pledged, indorsed, negotiated, assigned, or transferred by the seller to such person;

(7) That there is an underlying agreement between the seller and such person concerning the pledging, indorsing, negotiation, assigning, or transferring of sales contracts; or

(8) That the financing organization or its affiliates also provide franchising, financing, or other services to the seller-assignor.

RCW 19.52.120.

¶13 Almost all of the "events" described in the subsections of RCW 19.52.120 are found in *Thomsen* and in the case before this court. Many of these events were factors that led the *Thomsen* court to declare that the conditional sales contract was actually a direct loan from the finance company to the buyer. *See, e.g., Thomsen*, 80 Wn.2d at 413-14 (the seller arranged to assign the obligation to the financing organization before or concurrently with the sale; the document used to evidence the sale was supplied by the financing organization; this document was then assigned to the financing organization; and there was an underlying agreement between the seller and the financing organization concerning the assignments of sale contracts). The clear language of RCW 19.52.100 and RCW 19.52.120 exempts a conditional sales contract like the one between the Bells and Central Valley, financed by People's Credit, from the usury laws. *See Topline Equip., Inc. v. Stan Witty Land, Inc.*, 31 Wn. App. 86, 91 n.3, 639 P.2d 825 (1982) (after *Thomsen*, enactment of RCW 19.52.120 specifically prohibited application of the provisions of chapter 19.52 RCW to any conditional sales contract).

¶14 Even so, the Bells argue, a transaction exempt from the usury laws does not escape regulation by the CLA. Recognizing that borrowers who are higher than average credit risks find it difficult to obtain credit at allowable rates, the legislature enacted the CLA to "authorize higher interest rates for certain types of loans, subject to the conditions and limitations contained in this chapter in order to ensure credit

availability." RCW 31.04.005. A person licensed under chapter 31.04 RCW may lend money at a rate that does not exceed 25 percent per annum. RCW 31.04.105(1). No one may make loans at the interest rates authorized by this chapter without first obtaining a license. RCW 31.04.035. The licensee's loans to a state resident must comply with the CLA "unless such loan is made under the authority of another license issued pursuant to a law of this state or under other authority of a law of this state." RCW 31.04.025. The statute specifically provides that it does not apply to anyone doing business under laws relating to banks, savings banks, trust companies, savings and loans or building and loans, credit unions, pawnbrokers, or credit card plans. RCW 31.04.025.

¶15 The Bells argue that RCW 31.04.035 requires everyone (except the exempted entities) who wants to extend a loan with an interest rate greater than 12 percent and up to 25 percent per annum to be licensed under the CLA. But the clear language of the statute does not so provide. Only those who want to make loans at the interest rates authorized by the statute are required to obtain a license. RCW 31-.04.035. The state department of financial institutions, which has the power to interpret this statute (RCW 31.04-.165), issued an interpretive letter in March 2002 that explained the voluntariness of licensing under the statute. Addressing the correlation of the CLA to the usury laws, program manager Whittier Johnson stated that

> [w]ith respect to arguments regarding state law, the Department's opinion is that the licensing provision in RCW 31.04.035 is a voluntary standard. The exemption from usury conveyed by the Act is a privilege of licensing that a company may choose to obtain, a privilege that grants the authority to make loans at rates in excess of Washington's usury limits. The Department's opinion is that the licensing provision of the Consumer Loan Act is not a requirement . . . .
>
> . . . It is the Department's opinion that a company that makes loans at rates authorized by the Consumer Loan Act without a consumer loan license potentially violates the state's usury statute, a statute we do not enforce, not the Consumer Loan Act . . . .

. . . .

In summary, we do not believe that a lender is required to be licensed under the Consumer Loan Act, rather that a licensee [may choose] to be licensed to avail itself of the authority to exceed the state's usury limit granted by such a license.

CP at 186.

¶16 One problem with the Bells' argument is that a retail installment sales contract is already exempt from the usury laws. RCW 19.52.100, .120. Central Valley was authorized under RCW 63.14.130 to execute a conditional sales contract with any service charge agreed to by the parties. Neither Central Valley nor its assignee, People's Credit, needed a license under the CLA to "exceed the state's usury limit." CP at 186 (interpretive letter). Further, a lender is not required to obtain a license under the CLA. Only licensees are subject to the terms and restrictions of chapter 31.04 RCW. RCW 31.04.035. Any unlicensed person who engages in the business of making loans at a rate above what is allowed by the usury laws potentially violates only the usury statute, not the CLA. CP at 186 (interpretive letter).

¶17 Statutes are read together to give effect to all and to harmonize each with the others. *Bour v. Johnson*, 122 Wn.2d 829, 835, 864 P.2d 380 (1993). The Washington legislature has seen fit to provide different interest rate limits for different types of transactions. Generally, RCW 19.52.020(1) authorizes an interest rate at 12 percent per annum or 4 percentage points above the recent average treasury bill rate, while RCW 31.04.105 allows licensees to exceed this rate up to 25 percent. Retail installment sales contracts and sales contracts for goods with deferred payment of the purchase price are exempt from the usury laws. RCW 19.52.100, .120. The retail installment sales statute specifically allows retail installment transactions to exceed the usury rate, at any level agreed upon by the parties and disclosed in the contract. RCW 63.14.130. These statutes, when applied according to their plain language, do not conflict and allow extensions of credit to those with all levels of credit risk, albeit frequently with onerous interest rates.

¶18 Washington courts have long recognized that there is no vested right in a particular usury law or ceiling on the rate of interest. *Cazzanigi v. Gen. Elec. Credit Corp.*, 132 Wn.2d 433, 441-42, 938 P.2d 819 (1997). Ultimately, nothing in the CLA requires a seller or its assignee under a retail installment transaction to be licensed under the CLA or to comply with its interest limits. The CLA is supposedly designed to provide credit to those who cannot obtain credit otherwise. RCW 31.04.005. For retail buyers who purchase goods with deferred payments, the exemptions under RCW 19.52.100 and RCW 19.52.120 and the provisions in chapter 63.14 RCW already authorize extensions of credit to those with a higher than average credit risk. Consequently, such buyers do not come under the policy and purpose of the CLA.

¶19 We sympathize with consumers who have little—if any—negotiating power in setting interest rates on their conditional sales purchases. However, we are constrained by clear legislative language to conclude that licensing under the CLA is not required for retail sellers who enter into retail installment sales contracts and sales of goods with deferred payments. The trial court did not err in granting summary judgment dismissal of this cause of action.

### Truth in Lending Act

¶20 The Bells next contend Central Valley violated TILA by hiding an $11.50 administrative fee in the "License Fee" itemized on their retail installment sales contract.[1] CP at 28. Central Valley charged the Bells $73.50 in the section of the contract labeled "Other Charges Including Amounts Paid to Others on Your Behalf," under a subsection labeled "Official Fees Paid to Government Agencies." CP at 28. This fee was included in the amount financed. In December 2003, four months after the Bells filed suit, People's Credit sent a letter to the Bells notifying them that it had discovered a mistake in the charging of that fee:

---

[1] Contrary to Central Valley's contention, the Bells did not raise this issue for the first time on appeal. The issue of the $11.50 overcharge and the resulting unlawful variance on the annual percentage rate was raised in their response to Central Valley's motion for summary judgment.

It has been brought to our attention that the actual licensing fees paid by the Dealer on your 1993 Chevrolet Astro Van were $11.50 less than shown on your contract. Peoples Credit has credited your account for $11.50 as a refund on the licensing fees. We have reapplied your payments since inception and have reduced your finance charge accordingly.

. . . .

Enclosed, please find an amended Truth in Lending Disclosure that reflects a total decrease in your finance charge of $3.77.

CP at 492. The amended TILA disclosure reflects the lower amount financed, total of payments, and total sale price. In response to this information, the Bells included in their April 2004 memorandum in opposition to the motion for summary judgment a claim that the inaccurate disclosure in the original sales contract constituted a failure to disclose the amount financed under TILA. We review the trial court's order dismissing this claim on summary judgment de novo. *Jones v. Allstate Ins. Co.*, 146 Wn.2d 291, 300, 45 P.3d 1068 (2002).

¶21 TILA was enacted in 1968 to ensure that credit terms are disclosed to consumers so that they will be able to compare various available credit terms and to "avoid the uninformed use of credit." 15 U.S.C. § 1601(a); *Koons Buick Pontiac GMC, Inc. v. Nigh*, 543 U.S. 50, 54, 125 S. Ct. 460, 463, 160 L. Ed. 2d 389 (2004). "The Act requires a creditor to disclose information relating to such things as finance charges, annual percentage rates of interest, and borrowers' rights, and it prescribes civil liability for any creditor who fails to do so." *Nigh*, 543 U.S. at 54 (citations omitted) (citing 15 U.S.C. §§ 1631-1632, 1635, 1637-1640). The Federal Reserve Board adopted Regulation Z to set forth the specific content and timing of the disclosures. *Bragg v. Bill Heard Chevrolet, Inc.-Plant City*, 374 F.3d 1060, 1065 (11th Cir. 2004), *cert. denied*, 543 U.S. 1089 (2005). We construe TILA liberally in favor of the consumer. *Id.*

¶22 In a consumer credit transaction such as the conditional sales contract here, the creditor must make the specific disclosures listed in 15 U.S.C. § 1638.[2] Each of these disclosures was made to the Bells in their original retail

installment sales contract and in the amended TILA disclosure sent to them by People's Credit. A creditor who fails to make accurate disclosures is liable to an individual for actual damages, twice the amount of the finance charge, the costs of the action, and reasonable attorney fees. 15 U.S.C. § 1640.

¶23 One of the categories required to be disclosed under the itemization of the amount financed is the amount paid to third persons on the consumer's behalf. 15 U.S.C. § 1638(a)(2)(B)(iii). In the Bells' contract, Central Valley stated that it paid $73.50 to the government as a license fee. According to People's Credit, Central Valley actually paid $62.00 and retained $11.50 as an "upcharge," a tacked-on dealer charge that is common in the automotive sales industry. *Green v. Levis Motors, Inc.*, 179 F.3d 286, 288 (5th Cir. 1999). Retention of a portion of the amount paid to others is allowable under TILA if it is disclosed to the consumer. *Gibson v. Bob Watson Chevrolet-Geo, Inc.*, 112 F.3d 283, 285 (7th Cir. 1997). When the fee is the same in cash and credit transactions, a simple disclosure that the dealer may retain a portion of the amount paid to third persons is sufficient. *Id.* at 285-86 (citing the official staff commentary to Regulation Z). Central Valley and People's Credit contend the upcharge here was the same whether the transaction was for cash or credit. The Bells do not contest this point. Consequently, the disclosures on the face of the retail installment contract do not violate TILA.

¶24 Notwithstanding the fact that the sales contract complies with TILA, the Bells contend the license fee inaccuracy admitted by People's Credit is evidence that Central Valley violated TILA's allowed variance of error in the dis-

---

[2] Pertinent to the consumer transaction here, Central Valley was required to disclose (1) the identity of the creditor; (2) the amount financed, including any charges that are not part of the finance charge; (3) the finance charge; (4) the annual percentage rate; (5) the total of payments for the amount financed and the finance charge; (6) the number, amount, and due dates scheduled for the payments; (7) the total sale price; (8) descriptions of the above terms; (9) a statement that a security interest has been taken in the property; (10) any charge for late payments; (11) whether the consumer is entitled to a rebate upon prepayment or is subject to a penalty; and (12) that the consumer should refer to the contract for information about such topics as nonpayment and prepayment. 15 U.S.C. § 1638.

closed interest rate charge. 15 U.S.C. § 1606(c). According to the Bells' calculations (the accuracy of which is not disputed by Central Valley), recalculation of the annual percentage rate after reducing the amount financed by $11.50 reveals that the Bells actually paid 30.32 percent per annum. They argue that this difference from the 29.95 percent per annum disclosed on the sales contract is more than one-eighth of one percent and is a per se violation of TILA and Regulation Z. 12 C.F.R. § 226.22(a)(2).

¶25 Generally the TILA disclosure requirements for the annual percentage rate are strictly imposed. *See Villanueva v. Motor Town, Inc.*, 619 F.2d 632, 634 (7th Cir. 1980) ("In view of these specific provisions for liability, the courts are not free to dismiss actions brought thereunder as trifles demeaning to the dignity of the federal judiciary."). However, People's Credit's allegation that Central Valley erred in charging the Bells $73.50 rather than the actual license fee of $62.00 is irrelevant. The retail installment sales contract complied with TILA by informing the Bells that a portion of the charges paid to others, including the license fee, could be retained by Central Valley. The disclosure did not have to specify the amount of that retained portion. *Green*, 179 F.3d at 290 (citing 61 Fed. Reg. 14,952, 14,954 (1996)). Because the license fee was not inaccurate, the Bells fail to show that Central Valley's calculation of the annual percentage rate was inaccurate.

¶26 The Bells also fail to raise an issue of fact regarding People's Credit's liability as an assignee for the allegedly inaccurate annual percentage rate. Generally an assignee is liable only for those errors that are apparent on the face of the document. 15 U.S.C. § 1641. However, the sales agreement here explicitly subjected any holder of the consumer credit contract to all claims and defenses that the Bells had against Central Valley. Nevertheless, because the license fee and annual percentage rate were not inaccurate under TILA, People's Credit is not liable.

¶27 Finally, we find that issues of fact remain on the Bells' claim under Washington's motor vehicle dealers and

manufacturers act, chapter 46.70 RCW. Former RCW 46.70-.180(2) prohibits the inclusion of terms in a vehicle sale agreement for administrative costs (such as licensing) that are not actually paid to the state. Any violation of the chapter constitutes a violation of Washington's Consumer Protection Act, chapter 19.86 RCW. RCW 46.70.310.

¶28   Central Valley contends RCW 46.70.180(2) is preempted by 15 U.S.C. § 1638(a)(2)(B)(iii). We are not convinced. Washington has a strong presumption against finding preemption. *Hisle v. Todd Pac. Shipyards Corp.*, 151 Wn.2d 853, 864, 93 P.3d 108 (2004). We will find preemption only if federal law clearly indicates a congressional intent to preempt state law or if there is a direct conflict between state and federal law that cannot be reconciled. *Id.* TILA explicitly states that it preempts state laws that require a creditor to make diclosures inconsistent with the requirements in 15 U.S.C. § 1638. 15 U.S.C. § 1610(a). The Washington statute declares that it is unlawful to include in a purchase and sale agreement any misleading statements, including license fees that include amounts that are not actually paid to the state. RCW 46.70-.180(2). The official staff commentary to Regulation Z provides that a disclosure that the dealer may retain a portion of the amount paid to others (including license fees) is sufficient to satisfy 15 U.S.C. § 1638(a)(2)(B)(iii). *Green*, 179 F.3d at 290 (citing 61 Fed. Reg. 14,952, 14,954 (1996)). As noted in a decision of the Board of Governors of the Federal Reserve System that sets out its principles for deciding whether state laws in Mississippi, New Jersey, Oklahoma, and South Carolina were preempted by TILA, "[a] state law is not inconsistent merely because it requires more information than federal law or requires disclosure in transactions where federal law requires none." Supplementary Information (2), 48 Fed. Reg. 43,672 (Sept. 26, 1983) (preemption analysis principles). Washington's requirement that the disclosure statements list the actual amount of license fees paid to the state is merely an additional disclosure that is not inconsistent with TILA.

¶29   The Bells have supported a prima facie case of an undisclosed charge for administrative costs. Former RCW 46.70-.180(2). Consequently, although we affirm the summary dis-

missal of the CLA claims and the TILA disclosure claims based on 15 U.S.C. § 1606(c) and 12 C.F.R. § 226.22(a)(2), we reverse the trial court's dismissal of the Bells' claim for violation of former RCW 46.70.180(2).

¶30 Reversed in part and remanded for trial.

SWEENEY, A.C.J., and BROWN, J., concur.

Reconsideration granted and opinion modified December, 8, 2005.